**In re CIRCUIT BREAKER LITIGATION.**

Nos. CV 88–03012 RG (Gx), 88–6025 RG (Gx), 88–6739 RG (Gx), 88–6741 RG (Gx) and 88–6744 RG (Gx).

United States District Court,
C.D. California.

May 17, 1994.

Gregory P. Stone, Ted Dane, Munger, Tolles & Olson, Los Angeles, CA, for plaintiff Westinghouse Elec. Corp.

George A. Oakes, Alan H. Stanfill, Throckmorton, Beckstrom & Oakes, Pasadena, CA, for defendants General Circuit Breaker & Elec. Supply, Inc., Panelboard Specialties Wholesale Elec., Inc., Xavier Contreras, and Jaime A. Contreras.

J. Scott Bennett, Law Offices of J. Scott Bennett, Lake Elsinore, CA, for defendants Panelboard Specialties Wholesale Elec., Inc., and Jaime A. Contreras.

Steven L. Smilay, Murchison & Cumming, Los Angeles, CA, for defendants AC Circuit Breaker–Electrical Supply and Joe A. Contreras.

Michael J. Emling, Moore & Rutter, Long Beach, CA, for defendants Pencon Intern., Inc., General Magnetics/Electric Wholesale, and Charley Contreras.

## ORDER FOR JUDGMENT.

GADBOIS, District Judge.

### I.

Six years ago, four circuit breaker manufacturers, Square D Company, General Electric Company, Underwriters Laboratories Inc., and plaintiff Westinghouse Electric Corporation ("Westinghouse"), filed forty cases with this Court, suing several circuit breaker reconditioners for trademark infringement, unfair competition, and state law causes of action.

Westinghouse's case against defendants Pencon International, Inc., General Magnetics/Electric Wholesale and Charley Contreras ("Pencon Defendants"), Panelboard Specialties Wholesale Electric, Inc. and Jaime A. Contreras ("Panelboard Defendants"), AC Circuit Breaker–Electrical Supply and Joe A. Contreras ("AC Circuit defendants"), and General Circuit Breaker & Electric Supply, Inc., Xavier Contreras, and Jaime A. Contreras ("GCB defendants") has been tried to a jury, and is now near a conclusion.

Many other pieces of the puzzle have yet to be tried, including defendants' previously severed antitrust counterclaims against

Westinghouse, and ten separate cases involving plaintiffs Square D Company,[1] General Electric Company,[2] and Underwriters Laboratories Inc.[3] Under the Local Rules of the Central District of California, these cases will almost certainly be tried by another judge.

## A. Background

Westinghouse is a major manufacturer and seller of molded case circuit breakers. Each breaker has a label bearing the Westinghouse trademark and listing information about the breaker's electrical characteristics. Some of these labels are permanent metal plates or ink-stamps; the rest are paper.

Defendants recondition and resell used Westinghouse circuit breakers. Occasionally, reconditioning requires minimal effort. At other times, defendants must replace certain components with new Westinghouse parts. Before 1988, defendants routinely replaced the breakers' seals,[4] and also replaced faded or otherwise illegible paper labels.[5] Westinghouse employees gave defendants some replacement labels;[6] defendants printed the remainder themselves, or gave the job to a professional printer.

Defendants did not add a notation to any of their breakers indicating that the breakers were reconditioned. Rather, the labels on the reconditioned breakers contained the same information as the original Westinghouse labels, including the Westinghouse trademark.

In 1988, Westinghouse filed suit against defendants, asserting claims for (1) trademark counterfeiting under section 32 of the Lanham Act; (2) unfair competition under section 43 of the Lanham Act; (3) unfair competition under the California Business and Professions Code; (4) unfair competition under the California common law; and (5) trademark dilution under California law.

Defendants did not deny selling reconditioned breakers with the Westinghouse mark and failing to label them as reconditioned. However, defendants maintained that they had not intended to deceive anyone and that Westinghouse knew, or certainly should have known, that defendants were selling reconditioned breakers bearing the Westinghouse mark. In fact, Westinghouse itself was one of defendants' major clients, and resold defendants' reconditioned circuit breakers without labeling them "reconditioned." Defendants asserted numerous affirmative defenses, including equitable estoppel, laches, acquiescence, and unclean hands. Defendants also contended that Westinghouse improperly sought to drive them out of business, and filed antitrust counterclaims.

## B. The Trial

After Westinghouse narrowly survived a motion for summary judgment based on the affirmative defenses, a jury heard the liability phase of the case. Since defendants did not deny reconditioning and reselling breakers bearing the Westinghouse mark without designating them as reconditioned, two issues dominated the trial: 1) whether the reconditioned breakers were likely to be confused with new breakers; and 2) the affirmative defenses.

Westinghouse appeared to prevail on the first issue, demonstrating that the defendants' reconditioned breakers might be con-

---

**1.** *Square D Company v. General Circuit Breaker and Electric Supply, Inc., et al.,* CV 88–03012; *Square D Company v. Panelboard Specialties Wholesale Electric, Inc. and Jaime Contreras,* CV 88–06747.

**2.** *General Electric Company v. General Circuit Breaker and Electric Supply, Inc. and Xavier Contreras,* Case No. 88–06027; *General Electric Company v. Pencon International, Inc., et al.,* CV 88–6736; *General Electric Company v. AC Circuit Breaker et al.,* CV 88–6732; *General Electric Company v. Panelboard Specialties Wholesale Electric, Inc. et al.,* CV 88–6738.

**3.** *Underwriters Laboratories Inc. v. Pencon International, Inc., et al.* CV 88–04750; *Underwriters Laboratories Inc. v. General Circuit Breaker and Electric Supply, et al.* CV 88–06727; *Underwriters Laboratories Inc. v. AC Circuit Breaker–Electrical Supply, et al.* CV 88–06723; *Underwriters Laboratories Inc. v. Panelboard Specialties Wholesale Electric, Inc., et al.* CV 88–06721.

**4.** The seals indicate whether the breaker has been opened.

**5.** When the original paper labels were in good shape or were permanent, defendants left them on the breakers.

**6.** Westinghouse maintains that these employees were renegades.

fused with new breakers. However, the evidence solidly supported defendants' affirmative defenses. They demonstrated that Westinghouse was, or should have been, abundantly aware that defendants sold reconditioned Westinghouse breakers bearing the Westinghouse mark without labelling them as reconditioned—as defendants repeatedly emphasized, Westinghouse itself was one of defendants' major customers. Westinghouse noted, however, that there was virtually no evidence that Westinghouse knew that defendants were in fact *copying* Westinghouse *labels,* rather than using original labels. At trial, Westinghouse suggested that copying labels was not only evidence of bad intent, but also a wrong in and of itself.

Although defendants admitted making duplicate Westinghouse labels, they steadfastly denied any wrongful intent. They argued that they did not bother labelling their breakers as "reconditioned" because defendants were well-known in the market— "we're a junk shop. People know who we are." Defendants also said that they believed that any purchaser of a reconditioned breaker would recognize it as such. As one defendant, Charley Contreras described it: "It's like if you're an old man, you can put on all the make-up you want, but you're not fooling anybody but yourself." Furthermore, defendants noted that if they were trying to deceive the public, they were doing an absurdly inept job—they not only often told customers when asked that the breakers were reconditioned, but also widely advertised themselves as breaker reconditioners.

According to defendants, replacing worn labels was not an effort to deceive, but a necessary part of reconditioning. After all, as even Westinghouse concedes, its labels do more than identify Westinghouse as the manufacturer—they provide critical information regarding the breaker's electrical characteristics. Various electrical codes and standards require breakers to bear such information, and copying Westinghouse's labels was simply the easiest way to do it.

Lastly, in support of its unclean hands defense, defendants demonstrated that after purchasing reconditioned breakers from de-

fendants, Westinghouse itself re-sold them directly without relabelling them as reconditioned.

## C. *The Jury's Verdict Forms*

On July 15, 1993, the jury returned its first verdict form, indicating that plaintiff had failed to prove any of its state law claims or its Lanham Act unfair competition claim, 15 U.S.C. § 1125. However, the verdict form indicated that plaintiff had proven its Lanham Act "trademark counterfeiting" claim, 15 U.S.C. § 1114, and that defendants "intentionally use[d] counterfeits of [some] of plaintiff's trademarks, knowing them to be counterfeits." [7] With regard to the affirmative defenses, the verdict form indicated that affirmative defenses applied to all of plaintiff's claims except the § 1114 claim.

This result appeared fatally inconsistent, as a claim under § 1114 should have established claims under § 1125 and also under the California Business & Professions Code.

Unwilling to risk improperly coercing a verdict, this Court did not inform the jury that its verdict was inconsistent. Instead, this Court asked it to return the following day, so that this Court and the parties could digest the verdict overnight and determine whether the jury needed to answer any further questions. The next day, after the jury had assembled in the jury room but before it had entered the courtroom, the jury sent a note to the bailiff indicating that it had made an error in transposing its results onto the verdict form, and asked if it could make corrections and submit a revised verdict form.

This Court obliged, and the jury submitted a revised verdict form, which indicated that plaintiff had proved both its § 1114 claim *and* its § 1125 claim, as well as its claim for unfair competition under the California Business & Professions Code. The verdict form continued to indicate that the jury found that affirmative defenses applied to all of plaintiff's claims except for the § 1114 claim.

Although the § 1114, § 1125, and California Business & Professions Code claims were now consistent, this Court was perplexed by

---

7. Response to Jury Verdict Form Question 6.

the jury's conclusions on the affirmative defenses. Defendants had produced extensive and highly persuasive evidence that Westinghouse knew, or should have known, that defendants were using the Westinghouse mark on reconditioned breakers without designating them as reconditioned. This evidence clearly justified the jury's finding that affirmative defenses applied to Westinghouse's § 1125 claim. Ordinarily, this evidence also should have mandated the same result on the § 1114 claim, since a § 1125 claim completely subsumes a § 1114 claim. *See, e.g., Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 859, 102 S.Ct. 2182, 2191, 72 L.Ed.2d 606 (1982); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274 n. 16 (7th Cir.1976); *American Exp. v. American Exp. Limousine Serv.,* 772 F.Supp. 729, 732 (E.D.N.Y.1991); *The Coca–Cola Company v. Cahill,* 350 F.Supp. 1231, 1233 (W.D.Okla.1972), *aff'd,* 480 F.2d 153 (10th Cir.1973). *See also* J. Thomas McCarthy, *McCarthy on Trademarks,* §§ 2.02, 2.03 (1992) (hereinafter "McCarthy").

Since the parties had agreed to try damages to the Court, and further intervention would seriously suggest coercion of a different verdict, this Court excused the jury and took evidence on damages. This Court also asked the parties to address the issue of verdict inconsistency and heard oral argument on the matter.

## II.

Now that the inconsistency issue has been thoroughly briefed and argued, the case comes into clear focus. The jury's answers were absolutely consistent with both the instructions and the evidence presented.

### A. *What Did Westinghouse Know?*

For the most part, defendants and Westinghouse agree that the jury necessarily made certain findings of fact. They agree that, in finding liability on both the § 1114 and § 1125 claims, the jury necessarily found: 1) that defendants sold reconditioned breakers bearing the Westinghouse mark; 2) that they did not designate them as "reconditioned"; 3) that they did so without Westinghouse's consent; and 4) that this practice was likely to cause confusion.

Defendants and Westinghouse also agree that since the jury found for defendants on the affirmative defenses to § 1125, it necessarily found that Westinghouse knew or should have known that defendants were selling reconditioned breakers bearing the Westinghouse mark without labelling them as reconditioned.[8]

Finally, both defendants and Westinghouse agree that the jury's findings on the § 1114 affirmative defenses indicate that Westinghouse did not know, nor should it have, that defendants happened to be *duplicating* Westinghouse *labels* rather than using *original* Westinghouse *labels* on the reconditioned breakers.[9]

---

8. *Brief of Plaintiff Westinghouse Electric Corporation in Response to the Court's Request for Final Briefs Regarding the Damages Phase of Trial,* September 29, 1993 at 22 ("There was testimony at trial that indicated that, while many [Westinghouse] salespeople believed they were buying only new products from the defendants, others were aware that the circuit breakers sold by the defendants were used and/or reconditioned. This testimony explains the jury's finding that the defendants established the defense of laches to Westinghouse's claim of unfair competition under 15 U.S.C. § 1125.") (*"Westinghouse Damage brief"*).

9. *See Trial Brief Regarding Recovery Under 15 U.S.C. 1117,* September 29, 1993 at 7 ("Clearly, the verdict reflects that the jury wanted to acknowledge that the equitable defenses were not available to excuse defendants' replication of Westinghouse's trademark; however, given Westinghouse's participation in an acquiescence

to the reconditioning and non-labelling activities, the jurors did not want to penalize defendants or reward Westinghouse as a result.") (filed by the AC Circuit defendants).

*See also Brief of Plaintiff Westinghouse Electric Corporation in Response to Defendants' Briefs Regarding the Damages Phase of Trial,* October 4, 1993 at 18–19 (*"Westinghouse Response"*):

In order to be on notice of its § 1125 claim, Westinghouse needed to have actual or constructive knowledge only that the defendants failed adequately to disclose the condition of the breakers that they sold. *In order to have notice of its narrower § 1114 claim, however, Westinghouse needed to have actual or constructive knowledge that the defendants were counterfeiting Westinghouse's trademarks and placing such counterfeit marks on used and reconditioned circuit breakers they sold to the public.*

The jury obviously wished to indicate in its verdict that Westinghouse knew or should have

888

This interpretation is perfectly consistent with the instructions. As both Westinghouse and defendants note, Instruction 65 required defendants to show that Westinghouse knew, or should have known, that defendants were *duplicating Westinghouse labels* rather than merely using original Westinghouse labels, in order to prove their affirmative defenses to § 1114. Such a showing was not required, however, to establish affirmative defenses to § 1125.[10] Since the instructions indicated that the original/copied label distinction was the only difference between the affirmative defenses, this interpretation is the only one that makes the jury's responses consistent.

Moreover, this Court has no reason to suspect that the jury lost sight of this distinc-

> known of the former conduct, but not the latter.... [T]he jury's verdict on Westinghouse's section 1114 claim purposely singled out defendants' counterfeiting activities as behavior of which the jury found Westinghouse not to be on notice....
>
> (Emphasis added).

10. Instruction 65 explained to the jury that:

> You must also assess plaintiff's knowledge of the facts underlying each of its claims separately. The law recognizes that a plaintiff with knowledge of one claim but deprived of information critical to another claim may still assert the claim about which it could not have known. Thus, even if you were to find that plaintiff knew the fact giving rise to its claims for trademark dilution or unfair competition, this does not mean that plaintiff also knew the facts giving rise to its claim for trademark counterfeiting under section 1114.
>
> In order to sustain their laches, estoppel, and acquiescence defenses against plaintiff's trademark counterfeiting claim, *defendants must prove that plaintiff knew or should have known all the facts giving rise to this particular claim, namely that defendants were copying the Westinghouse trademarks and applying them to* used and reconditioned molded case circuit breakers that were sold in commerce without adequate disclosure of their condition.
>
> (emphasis added).

11. According to Westinghouse's trial counsel:

> ... Section 1125 is essentially the same elements as [the elements of § 1114], except, as the Court instructed you, for a violation of 1125, you don't have to use a copy of the trademark. You can use the original trademark or the original label in some other fashion ...
>
> *Closing Remarks of Gregory Stone, Counsel for Westinghouse*, Transcript at 5224:13–18.

tion or misunderstood, forgot, or somehow refused to follow this instruction. Each juror had a copy of the instructions in the jury room, and both sides emphasized the instruction at closing argument. After telling the jury that the distinction between copied and original labels differentiated § 1114 and § 1125,[11] Westinghouse repeatedly highlighted Instruction 65, explaining that defendants had to prove knowledge of *copying* to establish affirmative defenses to § 1114.[12] Then, noting that defendants had failed to present any persuasive evidence that Westinghouse knew, or should have known, that defendants were *copying* labels, rather than using original labels, Westinghouse told the jury that it could not find affirmative defenses to the § 1114 claim.[13]

12. Westinghouse counsel clearly emphasized to the jury that label copying, not merely the use of the Westinghouse mark, was a key issue in the case:

> At the conclusion of my remarks today, I am going to ask you to find certain things. I am going to ask you to find that the defendants infringed the Westinghouse trademarks, that they counterfeited those marks, that they made labels, including the Westinghouse trademark, without any authorization to do so ...
>
> · · · · ·
>
> ... there were three critical issues in the case: [including] the Westinghouse trademarks, and whether they were copied by defendants.
>
> *Closing Remarks of Gregory Stone, Counsel for Westinghouse*, Transcript at 5219:13–5220:2.
>
> Then, discussing the affirmative defenses, Westinghouse counsel told the jury that defendants had to show that Westinghouse knew, or should have known, that defendants were copying labels:
>
> > And what are these true facts? Did Westinghouse have knowledge of them? The true facts are the defendants copied its trademarks, and they misrepresented the goods they sold.
> >
> > *Id.* at 5228:7–10.

13. As Westinghouse's counsel noted, little or no evidence suggested that Westinghouse knew, or should have known, that defendants were using duplicate labels instead of original ones:

> ... Did Westinghouse know the true facts [that defendants were copying labels, rather than merely using originals]? The testimony in that regard does not take very long to summarize.
>
> Paul Cavnar, who worked at the [Westinghouse] branch in San Diego for a year and a half, testified that on one occasion he received a breaker, and he was a little confused about whether it was from GCB or GMEW, but he ultimately concluded that it was from GMEW. He received one breaker that had a label taped

With considerably less enthusiasm, defendants also emphasized the impact of Instruction 65, noting that they had to prove that Westinghouse knew, or should have known, that defendants were making replacement labels.[14]

Thus, it is virtually undisputed that the jury found that although Westinghouse knew, or should have known, that defendants were using the Westinghouse mark on reconditioned breakers, they did not know that defendants were copying Westinghouse labels.

### B. *Defendants' Intent.*

The jury's findings regarding Westinghouse's notice are undisputed and clear. The jury's conclusions about defendants' intent, although the subject of some dispute, are clear as well. Defendants contend that the jury found that defendants intended to duplicate Westinghouse labels,[15] but did not intend to deceive anyone into believing that the reconditioned breakers were new. The jury was clearly instructed that, if it found any defendant intended to deceive, none of the

affirmative defenses applied.[16] Since the jury found that defendants had established their affirmative defenses to all of Westinghouse's claims except for the § 1114 claim (which is explained by Instruction 65), the jury obviously found that defendants had not intended to cause confusion.

Westinghouse disagrees, proposing instead that the jury found that the defendants intended to cause confusion when they replaced Westinghouse labels, but did not intend to cause confusion when they used original Westinghouse labels.[17] Neither logic nor the record supports such an interpretation. Moreover, Westinghouse's argument necessarily implies that the jury either disregarded its instructions or rendered an internally inconsistent verdict.

First, no evidence suggests that defendants intended to deceive when they photocopied labels, but did not intend to deceive when they sold reconditioned breakers bearing *original* Westinghouse labels. The record indicates that defendants' state of mind

---

on the front with a piece of shiny plastic tape, and that label looked to him to be shinier than the original label or somewhat different than the original label.

And that is the only evidence we have of a Westinghouse employee seeing a copied label put on a breaker by one of the defendants. Indeed, we don't know from Mr. Cavnar's testimony or from anyone at GMEW whether that label was an original taped back on or whether it was a copy.

. . . . .

. . . That is the only knowledge that anyone at Westinghouse had that any of the defendants were copying labels.

*Closing Remarks of Gregory Stone, Counsel for Westinghouse,* Transcript at 5229:16–5231:2.

After discussing Mr. Cavnar, Westinghouse's counsel spoke at length about the defendants' failure to prove that Westinghouse knew that defendants were using duplicated labels, rather than originals. After over twenty pages of oral argument, Westinghouse counsel finally concluded that "[n]o one [at Westinghouse] knew about the copying of labels." *Id.* at 5248:21.

14. Mr. Emling, counsel for the Pencon defendants, grimly told the jury about Instruction 65:

Well, you know, what did they have to know exactly [in order for you to find that the affirmative defenses apply to § 1114]? Now, apparently the way the instructions are coming out is, at least on the counterfeiting part, we are going to have to prove that they either

knew or should have known of the replacement labels. Okay. We have to live with that. *Closing Argument of Michael Emling, Counsel for the Pencon Defendants,* Transcript at 5318:24–5319:4. *See also Id.* at 5308:4–5 ("There is one count, the 1114 count, that requires replacement labels on it."); 5324:13–15 ("Now, you know, on one count at least we have to prove that they knew or should have known about relabeling in some sense.").

15. Obviously, defendants intended to reproduce labels when they employed a photocopy machine or professional printer.

16. *Instruction 66* ("If you find that any defendant, in selling used and reconditioned Westinghouse molded case circuit breakers, intended to cause confusion, or mistake, or deception, that defendant lacks the good faith necessary to establish its defense of laches, estoppel or acquiescence, and you may find for plaintiff on each of these defenses as to any such defendants."); *Instruction 52* ("[I]f you find that any defendant, in selling used and reconditioned Westinghouse circuit breakers and in copying Westinghouse's trademarks, intended to cause confusion, deception, or mistake among its immediate consumers or others such as downstream purchasers, then that defendant may not assert the defense of laches.").

17. *See Westinghouse Response* at 24–25.

was constant throughout. Defendants presented evidence indicating that they told customers when asked that the breakers were reconditioned, advertised themselves as breaker reconditioners, and assumed that everyone knew the breakers were reconditioned. No evidence indicated that defendants behaved one way when they sold breakers with duplicate labels and another way when they sold breakers with original labels. No testimony indicated that the breakers with new labels were in fact more confusing than those with original paper or permanent labels. In fact, substantial testimony indicated that, while some of defendants' "counterfeit labels" were virtually identical to those printed by Westinghouse, others were poorly made or were the wrong color or size. Thus, the most potentially confusing breakers were those which still bore their *original* labels, not those with copied labels. Westinghouse's suggestion that defendants did *not* intend to deceive when they were most likely to do so, yet *did* intend to deceive when they were *least* likely to do so simply makes no sense, and is not remotely supported by the evidence.

Second, Westinghouse's interpretation necessarily implies that the jury answered the verdict form inconsistently. For example, the jury was clearly instructed that Westinghouse's claim for unfair competition under the California Business & Professions Code covers "any unlawful, unfair, or fraudulent business act or practice," which quite obviously covers copying and applying replacement labels with an intent to deceive. *See Instruction 42*. If the jury had found such an intent, it would have found that Westinghouse proved their claim under the California Business & Professions Code, but could not have found for defendants on the affirmative

defenses because good faith is a prerequisite to the affirmative defenses under Instruction 66.[18]

Similarly, if the jury had found, as Westinghouse suggests, that defendants duplicated Westinghouse's mark with an intent to deceive, the jury necessarily would have found liability on the common law unfair competition claim as well. This claim requires "a species of fraud or deceit." *See Instruction 43*. Obviously, if the jury had found that defendants copied labels with the intent to deceive, it would have found that Westinghouse proved this claim.

■ By arguing that the jury found that defendants intended to deceive when they duplicated Westinghouse labels, yet did not intend to deceive when they used original Westinghouse labels, Westinghouse asks this Court to conclude that the jury responded illogically, without regard to the evidence, and inconsistently.[19] As even Westinghouse acknowledges, this Court must adopt an interpretation of the jury's findings that makes them consistent: "[w]here there is a view of the case that makes the jury's answers … consistent they must be resolved that way. [A] search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). *See also Toner v. Lederle Laboratories*, 828 F.2d 510, 512 (9th Cir.1987), *cert. denied*, 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988) ("the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case"). Therefore, this Court accepts the following facts as determined by the jury:

---

**18.** Although the jury did not, in fact, find any intent to deceive, it nevertheless found that Westinghouse proved its California Business & Professions Code claim because it found for Westinghouse on its Lanham Act claims. *See Instruction 42* ("[I]f you find in favor of Westinghouse on either of its federal claims under the Lanham Act, you should also find in favor of Westinghouse on its state law claim for unfair competition under the Business and Professions Code.").

**19.** The jury's finding that "the … defendants intentionally use counterfeits of any of plaintiff's

trademarks, knowing them to be counterfeits" does not change this interpretation. *See Jury's Response to Verdict Form Question 6.* Question 6 merely asked the jury if defendants knew that some of the labels they were using were not originally printed by Westinghouse—it did not ask whether by using Westinghouse's mark, defendants intended to deceive. Since Instruction 65 clearly made the act of copying labels an issue, this Court has no reason to suspect that the jurors would have interpreted Question 6 in any other manner.

1) Defendants used Westinghouse's marks on reconditioned breakers;

2) without Westinghouse's consent;

3) such use was likely to cause confusion.

4) Defendants did not intend to deceive the public with its use of the Westinghouse mark.

5) Westinghouse knew, or should have known, that defendants were selling reconditioned breakers bearing Westinghouse's marks.

6) Westinghouse did not know, nor should it have known, that defendants happened to be reproducing the labels.[20]

## III.

Having found that the "ultimate questions of fact were clearly submitted to the jury,"[21] and that the jury answered them in a manner consistent with the instructions and the evidence, this Court must now determine whether these facts entitle Westinghouse to damages or an injunction. This Court must determine a) whether these facts establish Westinghouse's § 1114 claim, and b) whether these facts establish affirmative defenses to § 1114.

### A. *Westinghouse Established Its § 1114 Claim.*

■ The jury found that Westinghouse established all of the facts necessary to prove its § 1114 claim. Where confusion would otherwise result, a reconditioned product must be labelled as "reconditioned" such that purchasers are aware of the true source of both the labor and the components which make up the product. This rule assures consumers that a given label indicates a given standard of quality control, and is supported by a half-century of jurisprudence. *See, e.g., Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir.1992) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991) ("A product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer."); *Singer Mfg. Co. v. Briley*, 207 F.2d 519, 521 n. 3 (5th Cir.1953); *Brandtjen & Kluge, Inc. v. Prudhomme*, 765 F.Supp. 1551, 1573 (N.D.Tex.1991); *Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F.Supp. 1387, 1394–95 (S.D.Tex.1989); *Adolf Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131, 135 (D.Colo.1980).

■ Notwithstanding this well-established line of authority, the Pencon defendants suggest that a Ninth Circuit decision decided after the jury returned its verdicts in this case, *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614 (9th Cir.1993), undermines Westinghouse's § 1114 claim.[22] As the Pencon defendants read *Intel*, sale of a reconditioned product violates § 1114 only if (1) it is relabeled as having a capacity that it does not have (the *Intel* facts); or (2) the changes to the break-

---

**20.** To this Court's dismay, the AC Circuit defendants make oblique and totally inappropriate references to post-verdict jury interviews, suggesting that the jury found that defendants had no bad intent and did not intend for Westinghouse to recover damages.

Indeed, one of the jurors, Lilian Johnson, wrote this Court in her own hand, stating that "The jury want [sic] to see the defendants cleared from damages claim." The letter seems to suggest that although the jury found that defendants had not committed any culpable act (they had not intended to deceive) the counterfeiting instructions nevertheless required them to answer some questions in Westinghouse's favor. Although Ms. Johnson did not refer to them specifically, she was obviously speaking of Instruction 65 and Question 6.

Of course, as AC Circuit should understand, Ms. Johnson's letter and AC Circuit's jury inter-

views are inadmissible, and this Court gives them no weight whatsoever. *See United States v. Rohrer*, 708 F.2d 429, 434 (9th Cir.1983); F.R.Evid. 606(b).

**21.** *Central Progressive Bank v. Fireman's Fund Ins. Co.*, 658 F.2d 377, 381 (5th Cir.1981).

**22.** *Intel* involved a blatant scheme to deceive, in which defendant mislabeled plaintiff's coprocessors, leading consumers to believe that the coprocessors were faster and more expensive than they actually were. *Id.* at 619. Nevertheless, the *Intel* defendant argued that it did not infringe under § 1114 because it did not misidentify the original source of the products. The Ninth Circuit disagreed, noting that the labels deceived, whether or not they correctly identified the coprocessor's original source. *Id.* at 619–20.

ers were "so extensive or so basic that it would be a misnomer to call the article by its original name." [23]

The Pencon defendants contend that the reconditioned breakers in the instant case were substantively the same as new breakers—thus, they cannot be liable under § 1114. Defendants grossly misread *Intel* and the Supreme Court case upon which it relies, *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947). *Intel* suggests that a defendant cannot label one product as another, *even if both products are made by the same source*. In other words, don't put a Mustang mark on your Ford Escort and try to sell it as a Mustang, even though both cars are made by Ford. *Champion* suggests that in some circumstances, "the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, *even though the words 'used' or 'repaired' were added.*" *Champion*, 331 U.S. at 129, 67 S.Ct. at 1138 (emphasis added). In other words, after your Mustang has been squashed into a metal cube by the wrecker, you cannot rebuild a Mustang from the scrap and sell it as a "used Ford Mustang", even though it was once a Mustang.

Neither case suggests that an automobile restorer can take a Mustang with 50,000 miles on it, restore it, roll back the odometer, and use the Ford Mustang mark such that consumers believe that it is a new Mustang, even if in fact it may be qualitatively identical to a new Mustang. That, in effect, is what the jury found that defendants did here. Thus, the jury properly concluded that Westinghouse proved its § 1114 claim.

B. *Defendants Established Affirmative Defenses to* **Both** *the § 1114 and § 1125 Claims.*

■ With regard to the affirmative defenses, the jury found:

1) Defendants did not intend to deceive the public with its use of the Westinghouse mark.
2) Westinghouse knew, or should have known, that defendants were selling reconditioned breakers bearing Westinghouse's marks.
3) Westinghouse did not know, nor should it have known, that defendants happened to be reproducing the labels.

Westinghouse argues that since the jury found that Westinghouse neither knew, nor should have known, that defendants were *copying labels*, defendants are liable for those breakers which bore copied labels, but not those which bore original labels.

Defendants counter that such a result is simply illogical and unsupported by the law. So long as Westinghouse knew, or should have known, that defendants were using the Westinghouse mark, it makes no difference whether Westinghouse knew that the labels were copies or thought they were originals. According to defendants, Instruction 65 erroneously focused the jury's attention on an irrelevant detail—whether Westinghouse knew that the defendants were duplicating labels.[24] Since the jury found for defendants on all of the requisites to the affirmative defenses, defendants ask this Court to enter judgment in their favor.

Instruction 65 thus becomes the fulcrum of this case. If it is a correct statement of law, this Court should calculate the damages to which Westinghouse is entitled. If it is not, this Court should conclude that Westinghouse is not entitled to monetary relief.

Instruction 65, one of seventy-two eventually adopted, was based on the mundane principle that proving an affirmative defense to one claim does not necessarily establish an affirmative defense to another claim because the elements of the claims may differ. *See, e.g., Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084,

---

23. *General Magnetics' Opposition Brief Re Damages*, October 4, 1993, at 2–3.

24. *See Defendant's Trial Brief Re: Damages*, September 29, 1993, at 15:

The lack of a finding for defendants on the defenses as to the 1114 claim arises from the erroneous instruction number 65, which re-

quired defendants to prove that plaintiffs knew or should have known of the actual copying of the mark, as opposed to the simple use of the mark under conditions giving rise to a likelihood of confusion.

(filed by the Pencon defendants).

105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Yeadon v. New York City Transit Authority*, 719 F.Supp. 204, 209 (S.D.N.Y.1989). This instruction is so standard, routine, and innocuous that it wriggled into the nearly 100–page packet of instructions without fanfare, notwithstanding defendants' timely objection.[25]

Westinghouse continues to contend that Instruction 65 was correct because the § 1114 and § 1125 claims have different elements and involve "different levels of culpability."[26] According to Westinghouse, the § 1114 claim has an additional element—that defendants *reproduced Westinghouse labels* rather than merely used original Westinghouse labels they already possessed. Moreover, Westinghouse argues that since § 1114 requires duplication of labels, it involves a greater level of culpability, since "counterfeiting labels" is inherently more sinister than deceiving with original labels. Westinghouse is incorrect, apparently still confused by 1) section 1114's requirement of "use in commerce [of] any reproduction, counterfeit, copy or colorable imitation of a registered mark"; and 2) section 1117's special penalties against those who "counterfeit."

█ Contrary to Westinghouse's belief, using duplicate *labels* is *not* an element of § 1114—plaintiff need prove only that defendants used reasonable facsimiles of the Westinghouse *mark*, regardless of whether they used original or photocopied *labels*.[27] To

hold otherwise would incorrectly shift the focus away from the fundamental "keystone" of both unfair competition and trademark infringement—likelihood of confusion[28]—onto something about which the Lanham Act is unconcerned—the mere act of photocopying. Since the public is no more likely to be deceived by a counterfeit *label* than they are by an original label (in fact, the opposite is true)[29], § 1114 does not distinguish between the two.

As Judge Posner remarked:

[W]e can see no difference, so far as the objectives of section 1114(1)(a) are concerned, between [unauthorized use of original labels] and making a reproduction [of the label]. The happenstance of having trademarks made by the owner in one's possession, so that one doesn't have to copy them, has no relevance to the purposes of the statute. Indeed, the danger of confusion is even greater because the "imitation" is not merely colorable, but perfect. The more fundamental point is that the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute.... The only function of a trademark is to designate a product or service, and the misconduct at which section 1114 is aimed consistent not in making the trademark without authorization but in affixing it to the wrong

---

25. *See, e.g., Supplemental Objections to Proposed Jury Instructions*, July 4, 1993 at 3, 6–7 (filed by the Pencon defendants).

26. *See Westinghouse Response* at 21.

27. Thus, the § 1114 and § 1125 claims have substantially identical elements for purposes of this lawsuit.

28. Trademark law does not confer "a complete monopoly over [a trademark's] use.... [T]he Lanham Act and its legislative history reveals no congressional design to bestow such broad property rights on trademark owners. Its scope is much narrower: to protect consumers against deceptive designations of the origin of goods and, conversely, to enable producers to differentiate their products from those of others." *International Order of Job's Daughters v. Lindeburg and Co.*, 633 F.2d 912, 918 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

*See also Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973) ("The essence of the wrong of trademark infringement is the passing off of the goods of one as those of another."); *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) ("Confusion, or the likelihood of confusion ... is the real test of trademark infringement."); *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 497 (2d Cir.1962) ("The keystone in that portion of the law of unfair competition which relates to trademarks is the avoidance of confusion in the minds of the buying public."); *McCarthy* § 2.03 ("Whatever route one travels, whether by trademark infringement or unfair competition, the signs give direction to the same enquiry—whether defendant's acts are likely to cause confusion").

29. The public is *less* likely to be deceived by a counterfeit label if the technology used is poor.

**894**

product; it is a[n irrelevant] detail whether the trademark was [original] or merely copied.

*General Electric Co. v. Speicher,* 877 F.2d 531, 534–35 (7th Cir.1989). Thus, even though the *Speicher* defendant had used *original* labels made by the plaintiff, the Court held that it was liable under § 1114. *Speicher's* conclusion that copying is not an element of § 1114 is hardly novel—courts have found parties using original labels liable for trademark infringement for over fifty years. *See, e.g., Polymer Technology Corp. v. Mimran,* 975 F.2d 58, 63 (2d Cir.1992) ("A distributor's failure to observe a restrictive condition on the type or class of customers with whom it may deal can constitute trademark infringement" under § 1114 even though the labels are original); *Interstate Battery System of America, Inc. v. Wright,* 811 F.Supp. 237, 244 (N.D.Tex.1993) (holding defendant liable for "trademark counterfeiting" under § 1114 where defendant "used certain stickers or labels acquired from Plaintiff and affixed such labels or stickers to ... batteries not manufactured by authorized manufacturers of Plaintiff"); *Adolf Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135 (D.Colo.1980) ("Although defendant's conduct does not literally involve reproduction, counterfeit, copy or colorable imitation of a trademark [but instead involves reselling beer in its original containers bearing its original labels], it nevertheless falls within the scope of § 1114 [because defendant did not follow Coors' control procedures to maintain the quality of the beer]"); *J.C. Penney Co. v. Parrish Co.,* 339 F.Supp. 726 (D.Idaho 1972) (holding that defendant could be liable under § 1114 for selling damaged Penney's merchandise without removing the trademarks); *Coty, Inc. v. Willingmyre,* 35 F.Supp. 346 (E.D.Pa.1940) (holding defendant liable for trademark infringement where it refilled plaintiff's original perfume bottles, which still bore plaintiff's original labels, with spurious perfume).

■ Since confusion is the touchstone of trademark law, and since copying labels is not an element of either a § 1114 claim or a § 1125 claim, the Lanham Act does not forbid the mere act of copying labels. *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) ("[Trademark] does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his."). *See also Shaw v. Lindheim,* 919 F.2d 1353, 1364–65 (9th Cir. 1990) ("[Plaintiff's] claim is not consistent with the Lanham Act's purpose of preventing individuals from misleading the public by placing their competitors' work forward as their own.... We decline to expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act provides an adequate remedy."); *American Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 663–64 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 218 (D.Md. 1988) ("Unlike a copyright, mere reproduction of a trademark is not an infringement."); *Bayer Co. v. Shoyer,* 27 F.Supp. 633, 637 (E.D.Pa.1939); *McCarthy,* § 6.04[2] ("Copyright law gives the author the right to prevent copying of the copyrighted work in any medium. Trademark law prevents the use of a similar mark on such goods or services as would probably cause confusion. Thus, the scope of rights in copyrights and trademarks is defined quite differently."). *Cf. Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 639 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956) ("[T]he wrong takes place not where the deceptive labels are affixed to the goods or where the goods are wrapped in the misleading packages, but where the passing off occurs ...").[30] Thus, where a trademark holder takes issue with the copying of his labels but has acquiesced to the use of his mark, he must either sue for a breach of a licensing

---

**30.** In fact, consumer welfare may be *promoted* where an independent dealers/repairer duplicates a mark in order to indicate the type of products they repair or sell, so long consumers are not confused in the process. *See, e.g., Volks-* *wagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir.1969), *supp. op.,* 413 F.2d 1126 (9th Cir.1969); *General Electric Co. v. A–All Appliance Parts Co.,* 224 U.S.P.Q. 1054, 1984 WL 63136 (E.D.Mich.1984).

agreement or rely on copyright law to provide protection, if he is entitled to any protection at all.[31]

The original/duplicate *label* distinction is also irrelevant to § 1117, which provides for stronger remedies against those who use "counterfeit" marks. Since the Act is concerned with confusion, it defines a counterfeit mark as one "identical with, or substantially indistinguishable from" plaintiff's mark. 15 U.S.C. § 1116(d)(1)(B)(ii). If, for example, a plaintiff were to use the registered trademark "Kortenkampwear" in camping gear and clothes, and a defendant were to apply the identical mark to non-Kortenkampwear camping products, the defendant would be a counterfeiter, *regardless* of whether it used labels originally printed by the plaintiff or made its own labels. In such a case, since the public is exceptionally likely to be confused by the use of identical marks, and such a defendant's conduct is often egregious, § 1117(b) provides for treble damages absent exceptional circumstances. *See Speicher,* 877 F.2d at 537 (ordering the district court to contemplate treble damages under § 1117(b), even though defendant used labels printed by the plaintiff).

If, on the other hand, a defendant uses the mark "KurtsKampingwear" on non-Kortenkampwear products, it would not be a counterfeiter since this mark is not "identical with, or substantially indistinguishable from" the plaintiff's mark. Although this may not prevent the defendant from being found liable for trademark infringement under § 1114 if the defendant's label is held to be a "colorable imitation" of plaintiff's mark, it will protect the defendant from being liable for treble damages. 15 U.S.C. § 1117(a). *See*

*McCarthy,* § 25.01[5][b] ("[T]he Lanham Act carves out 'counterfeit' as a more egregious type of 'colorable imitation.' When courts have used the term 'counterfeit,' it has usually been in the context of invoking greater discretionary remedies.").

Thus, in the instant case, whether defendants copied labels or used original Westinghouse labels is irrelevant. Defendants were liable under § 1114, if at all, for *all* reconditioned breakers which were likely to cause confusion, including those with original and those with duplicate labels. Moreover, defendants were exposed to treble damages liability, if at all, for *all* reconditioned breakers bearing either original Westinghouse labels or copies, so long as those copies were "substantially indistinguishable from" the original Westinghouse labels. To establish an affirmative defense to § 1114, defendants needed only to prove that Westinghouse knew that defendants were using the Westinghouse mark. They did not need to prove that Westinghouse knew that defendants were *copying* labels. Since the jury found that Westinghouse knew, or should have known, that defendants were selling reconditioned breakers bearing the Westinghouse mark without labeling them as reconditioned, it found that defendants established each and every element necessary to prove an affirmative defense to Westinghouse's § 1114 and § 1125 claims.[32]

Consequently, this Court concludes that Westinghouse is entitled to no monetary recovery whatsoever, and will enter judgment to that effect. *See Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 685 (11th Cir.1983) ("[W]here a commonsensical interpretation of the various verdict

---

**31.** A contrary result, which Westinghouse champions, is inconsistent not only with a half-century of jurisprudence, but also with logic itself. Suppose that a trademark holder knows that a reconditioner has a pallet of labels, originally printed by the trademark holder, and knows that the reconditioner intends to use these labels on its reconditioned breakers. After a fire at the reconditioner's place of business, which destroys half of the labels, the reconditioner makes exact copies to replace the burned labels, puts them on his breakers, and sells them. Does trademark law now give the trademark holder a right to sue for damages? Of course not. The trademark laws are concerned with the use of *marks,* and

the trademark holder in this example has already acquiesced to the use of his mark.

**32.** Westinghouse might argue that the jury's decision to amend its verdict form indicates confusion and irreparably taints the trial. This Court disagrees. The jurors specifically explained that they had made an error in transposition, and did not indicate that they were confused. This Court accepts their explanation, as any observer of this trial must: the jury's final answers are consistent with both the evidence and the instructions. The jury understood its task and executed it capably.

forms … makes clear [the jury's] intent," the district court appropriately denied a new trial and entered judgment consistent with that intent). *Cf. Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1356 (9th Cir.1987); F.R.Civ.P. 49.[33]

## IV.

To the extent that Instruction 65 implied that the original/copied label distinction had legal significance, it erred. However, this error is harmless and does not prevent this Court from entering judgment consistent with the jury's findings. Although Instruction 65 favored Westinghouse by suggesting that copying labels is in and of itself a legal wrong, the jury found each and every fact necessary to establish the affirmative defenses. Since nothing suggests that the jury would have resolved the facts differently but for the error, the error is harmless. *See, e.g., Cancellier v. Federated Dept. Stores*, 672 F.2d 1312, 1316 (9th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982) ("There is no indication in the proceedings that the outcome would have changed if the [proper] jury instruction had been given; to the contrary it affirmatively appears from the record that the instruction did not prejudice defendant. This case was not decided by a hairsbreadth."); *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 983–84 (Fed.Cir.1989) (finding error harmless where the jury found patent valid, in spite of an instruction which placed too great a burden on patentee to demonstrate validity); *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1236–37 (Fed.Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989) (same). *Cf. McKenzie v. Risley*, 842 F.2d 1525, 1530 (9th Cir.), *cert.*

*denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988) (in a criminal case, jury instruction is harmless "if the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same.") (quoting *Pope v. Illinois*, 481 U.S. 497, 503 n. 6, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987)).

Westinghouse might argue that even without Instruction 65, the jury might have deliberately found for Westinghouse on the § 1114 affirmative defenses and against it on all of the other claims, intending to play Solomon and give defendants and plaintiff each half a baby. Westinghouse may contend that by entering judgment consistent with the jury's factual findings, this Court deprives the jury of its opportunity to split the baby in half.

This argument is unavailing. At a minimum, it is fatally speculative. Considering the evidence presented on affirmative defenses and unclean hands, this Court cannot fathom that any jury would have attempted to split the difference and give Westinghouse the benefit of an inconsistent verdict.

■ Second, even if the jury had intentionally reached an unfounded and anomalous result, this Court doubts whether such a verdict would have withstood scrutiny. Although, as a rule, civil juries must return consistent verdicts,[34] some argue that an inconsistent verdict should be allowed to stand when it is the product of jury intent rather than jury confusion. *See* Alexander M. Bickel, Note, *Judge and Jury—Inconsistent Verdicts in the Federal Courts*, 63 Harv.L.Rev. 649, 654–55 (1950); *Hines v. IBG Int'l, Inc.*, 813 F.2d 1331, 1334 (4th Cir.1987). Judge

---

**33.** In *L.A. Nut House*, the jury entered a general verdict which was inconsistent with the special interrogatories. The Ninth Circuit held that the district court was permitted to enter judgment consistent with the answers to the special interrogatories, which were themselves consistent. Thus, even when a jury may have evidenced confusion by reaching an inconsistent general verdict, a district court is permitted to enter judgment consistent with the jury's factual findings.

In the instant case, the jury's responses suggest no such confusion. Their responses are com-

pletely consistent with the jury instructions and the evidence presented. If, as in *L.A. Nut House*, a court has discretion to enter judgment consistent with a jury's factual findings even where the jury's inconsistent general verdict suggests confusion, it must be proper to enter judgment consistent with a jury's factual findings where, as here, the jury has responded to the instructions in an absolutely consistent manner.

**34.** *See, e.g., Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963).

Easterbrook counters, however, that such verdicts may indicate compromise, which dilutes the requirement that verdicts be unanimous, or worse, may indicate confusion. *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 677 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).[35] This Court adds that such verdicts not only dilute the law but also discourage settlement of large cases by eliminating some of the risk of trial. Thus, this Court concludes that entering judgment for defendants on all of their affirmative defenses does not deprive Westinghouse of its right to an inconsistent verdict, since no such right exists.[36]

■ At any rate, Westinghouse deprived itself of any such right by championing a misleading instruction which implied that the Lanham Act forbids the act of copying labels. Westinghouse cannot now argue that the jury would have reached a Solomon-like verdict if only this Court had not given the instruction which Westinghouse itself advocated.[37] *See Cancellier*, 672 F.2d at 1316 ("Significantly, the challenged instruction was fashioned by the judge from language submitted by [the party now contending that it is not harmless error].").

### V.

"It has long been established that a litigant 'is entitled to a fair trial but not a perfect one.'". *Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1460 (9th Cir.1989) (quoting *Brown v. United States*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973)); *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 1066 (Fed.Cir.1987) ("trials must be fair, not perfect"). Here, the trial was not perfect but it was more than fair to Westinghouse, which received the benefit of Instruction 65. In spite of Instruction 65's suggestion that copying labels is a wrong in and of itself, the jury found all facts necessary for defendants to prevail on their affirmative defenses to all claims, and found that defendants did not intend to deceive. In these circumstances, the error is harmless. Westinghouse is entitled to neither damages nor a new trial.

However, since the jury found that Westinghouse proved its § 1114 and § 1125 claims, Westinghouse may be entitled to an injunction. This Court therefore invites the parties to submit supplemental briefs on the appropriate form of injunctive relief in light of this order. These briefs shall be filed no later than Friday, July 8, 1994.

**IT IS SO ORDERED.**

---

35. Although Judge Easterbrook spoke of inconsistencies between different parties, not different claims, his concerns are applicable to both cases.

36. *See also Riley v. K Mart Corp.*, 864 F.2d 1049 (3rd Cir.1989). In *Riley*, the district court gave an erroneous answer to a jury question, misstating the legal effect of a factual finding they were required to make. Shortly thereafter, the jury returned its results.

Instead of entering judgment consistent with the jury's factual findings, the district court resubmitted the matter to the jury, telling them that he had erroneously explained the law, although he had correctly instructed them to resolve all of the material factual disputes. Realizing that their factual findings had a different legal effect than they had initially believed, the jury reconvened and submitted a second set of answers. Although the jury's revised factual findings differed markedly from their first set of answers, the district court entered judgment consistent with the second set of answers. The

Third Circuit reversed, finding that the jury should not have been invited to manipulate its factual findings in order to achieve a specific result.

The Third Circuit remarked that although the district court had erroneously described the legal consequences of the jury's findings, it could have entered judgment based on the first set of answers since the factual issues were clearly presented to the jury. *Id.* at 1052.

That is exactly what this Court does here.

37. *See Plaintiff Westinghouse Electric Corporation's Objections to Defendants' Supplemental Proposed Jury Instructions and Argument in Support of Westinghouse's Supplemental Instructions, July 1, 1993* at 52 ("[I]n order to defeat Westinghouse's counterfeiting claim, defendants must show that Westinghouse knew or should have known not merely of their sale of breakers bearing the Westinghouse mark, but also of their application of copies of the Westinghouse trademark to the used and reconditioned breakers they sold.").