**INTERNATIONAL ORDER OF JOB'S DAUGHTERS, Plaintiff–Appellee,**

v.

**LINDEBURG AND COMPANY, Defendant–Appellant.**

No. 78–1674.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1980.

Decided Dec. 10, 1980.

Rehearing Denied Feb. 11, 1981.

Charles E. Townsend, Jr., San Francisco, Cal., argued, for defendant–appellant; George M. Schwab, Townsend & Townsend, San Francisco, Cal., on brief.

Dennis L. Thomte, Omaha, Neb., argued, for plaintiff–appellee; Zarley, McKee, Thomte, Voorhees & Sease, Omaha, Neb., on brief.

Appeal from the United States District Court for the Northern District of California.

Before TRASK and FLETCHER, Circuit Judges, and BLUMENFELD,* District Judge.

FLETCHER, Circuit Judge:

Appellee, the International Order of the Daughters of Job (Job's Daughters), sued appellant Lindeburg and Co. (Lindeburg), for trademark infringement arising out of Lindeburg's manufacture and sale of jewelry bearing the Job's Daughters insignia. The district judge granted judgment for Job's Daughters. Lindeburg appeals, invoking appellate jurisdiction under 28 U.S.C. § 1291. We reverse and remand.

Job's Daughters is a young women's fraternal organization. Since its establishment in 1921 it has used its name and emblem[1] as collective marks.[2] Since its inception Job's Daughters has licensed at least one jeweler to produce jewelry for it. Job's Daughters sells some of the licensed jewelry directly to its members. Jewelry bearing the name or emblem is also sold by approximately 31,000 retailers across the nation. Most of these retailers presumably have no connection with the Job's Daughters organization. Some sell jewelry manufactured by Job's Daughters' licensees; others sell jewelry manufactured by jewelers not licensed by the organization.

Lindeburg makes and sells fraternal jewelry. In 1954 it began selling jewelry and related items bearing the Job's Daughters insignia. In 1957 Lindeburg asked the Job's Daughters trademark committee to designate it an "official jeweler." The committee refused and in 1964 and 1966 asked Lindeburg to stop manufacturing and selling unlicensed jewelry. Lindeburg did not comply with this request. In 1973 Lindeburg again sought permission to act as an official jeweler for Job's Daughters. Permission was granted for one year and then withdrawn.

In 1975 Job's Daughters brought this suit against Lindeburg, alleging that he had infringed their "common law trademark" rights. The district court granted judgment for Job's Daughters after an exten-

---

* Honorable M. Joseph Blumenfeld, Senior United States District Judge for the District of Connecticut, sitting by designation.

1. The emblem consists of a representation of three girls within a double triangle. The girls carry a dove, an urn, and a cornucopia. Between the bases of the two triangles are the words "Iyob Filiae," the Latin translation of "Daughters of Job."

2. A collective mark denotes membership in an organization. A trademark, in contrast, identifies goods produced, sponsored, or endorsed by a particular organization and distinguishes them from goods originating from others. Compare 15 U.S.C. § 1127, ' 13 with 15 U.S.C. § 1127, ' 10. See J. McCarthy, Trademarks & Unfair Competition § 4:4 (1973). The distinction has no import in this case and we have used the terms interchangeably.

sive trial and enjoined Lindeburg from further use of the name or emblem. The court held, however, that Job's Daughters' long acquiescence in Lindeburg's infringement barred the award of damages.

## I

## JURISDICTION [3]

In its complaint Job's Daughters did not invoke any particular jurisdictional statute, but did recite the factors establishing diversity jurisdiction under 28 U.S.C. § 1332: diverse citizenship and a sufficient amount in controversy. Lindeburg did not contest this implicit jurisdictional assertion, and the district court expressly held that diversity jurisdiction was present. The parties, however, relied exclusively on cases decided under federal trademark statutes and never referred to state law. Because the assertion of diversity jurisdiction would ordinarily be appropriate where the right asserted is grounded in state law, the invocation of cases decided under federal law creates confusion about the applicable law and sparks our inquiry.

The source of the right sued upon, not the ground on which federal jurisdiction is invoked, determines whether federal or state law applies. *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540–41, n.1 (2d Cir. 1956). We must, therefore, determine the source of the right upon which this lawsuit is based.

The parties have apparently assumed the existence of a general common law governing all trademark infringement cases brought in federal court.[4] This assumption is incorrect. Save as an outgrowth of federal statutory or constitutional law, there is no federal common law. *Compare Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the state. . . . There is no federal general common law."), *with Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110, 58 S.Ct. 803, 810, 82 L.Ed. 1202 (1938) (applying "federal common law" to resolve a controversy regarding an interstate stream). *See generally*, P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, *The Federal Courts & The Federal System*, 756–832 (2d ed. 1973). Accordingly, to succeed, Job's Daughters must assert rights found either in state law or federal statutory law.

This seemingly simple proposition is rendered difficult by the complex relationship between state and federal trademark law. In general, the common law has been understood as protecting against the broad business tort of "unfair competition." Trademark infringement is a species of this generic concept. *See New West Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979). The Lanham Act created a federal protection against two types of unfair competition, infringement of registered trademarks, 15 U.S.C. § 1114, and the related tort of false designation of the origin of goods, 15 U.S.C. § 1125(a).[5] Federal courts have jurisdiction

---

**3.** The parties have not raised this issue, but we must, *sua sponte*, inquire into the precise nature of our jurisdiction. *Louisville & Nashville R.R. Co. v. Motley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908).

**4.** By the phrase "common law" we mean rules of decision which do not expressly derive from a constitutional or statutory source, as distinguished from judge–made rules formulated in the course of constitutional or statutory interpretation. *See* P. Bator, P. Mishkin, D. Shapiro, H. Wechsler, *The Federal Courts and the Federal System*, 769–70 (2d ed. 1973).

**5.** In *Stauffer v. Exley*, 184 F.2d 962 (9th Cir. 1950), this court stated that section 44 of the Lanham Act, 15 U.S.C. § 1126, created a federal protection against unfair competition. *See also Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952). The *Stauffer* language intimates the existence of federal law extending well beyond the categories of trademark infringement and false designation of the origin of goods. Several commentators have criticized the *Stauffer* language, J. McCarthy, *Trademarks & Unfair Competition* § 32:2E (1973); *Developments in the Law–Trademarks and Unfair Competition*, 68 Harv.L.Rev. 814, 878–81 (1955), and most circuits have rejected the idea of such a broad federal protection.

to hear suits invoking these protections. In addition, many states by statute or judge—made law protect against trademark infringement and other types of unfair competition, such as misappropriation of the fruits of another's labor, *see Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977); theft of trade secrets, *see Pachmayr Gunworks, Inc. v. Olin Mathieson Chemical Corp.*, 502 F.2d 802, 807–08 (9th Cir. 1974); and trade disparagement, *see Kemart Corp. v. Printing Arts Research Laboratory, Inc.*, 269 F.2d 375, 388–94 (9th Cir.), *cert. denied*, 361 U.S. 893, 80 S.Ct. 197, 4 L.Ed.2d 151 (1959). These protections need not track those provided by the Lanham Act. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964); *John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 317 (E.D.Pa.1976), *modified sub nom. Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3rd Cir. 1978); *Markel v. Scovill Mfg. Co.*, 471 F.Supp. 1244, 1249 (W.D.N.Y.), *aff'd*, 610 F.2d 807 (2d Cir. 1979). If diversity factors exist, federal courts of course have jurisdiction to hear suits asserting these state law protections.[6] Thus, a plaintiff complaining of trademark infringement in federal court may invoke either federal or state protections, or both.[7]

Confusion as to the source of the substantive law is understandable because federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent. *See K–S–H Plastics, Inc. v. Carolite, Inc.*, 408 F.2d 54, 59 n.2 (9th Cir.), *cert. denied*, 396 U.S. 825, 90 S.Ct. 69, 24 L.Ed.2d 76 (1969); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir. 1980); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 382 n.14 (5th Cir. 1977); *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270 n.5 (2d Cir. 1974); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n.1 (2d Cir. 1958). Therefore the choice of federal or state law frequently has no impact on the outcome, leading courts to avoid the issue. *See, e. g., K–S–H Plastics, Inc. v. Carolite, Inc.*, 408 F.2d 54, 59 n.2 (9th Cir. 1969); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir. 1980). This does not, however, alter the fact that there are distinct federal and state rights.

Neither of the litigants before us has distinguished between state and federal

---

*See, e. g., Royal Lace Paper Works, Inc. v. Pest–Guard Prods., Inc.*, 240 F.2d 814, 816–20 (5th Cir. 1957); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 651–54 (3d Cir. 1954); *American Auto. Ass'n, Inc. v. Spiegel*, 205 F.2d 771, 774–75 (2d Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391 (1953). We do not read *Stauffer* so broadly. The case did not involve the whole range of business torts that are generally thought to be treated under state law, but rather involved the narrower tort of falsely designating the origin of goods. Other circuits have applied 15 U.S.C. § 1125 in such situations. *See Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Moreover, some of the language in *Stauffer* seems to limit its applicability to false designations of origin: "[T]he protection granted by the Lanham Act against unfair competition ... is limited ... to 'the remedies provided in this chapter for infringement of marks ....' " 184 F.2d at 965. This court has previously suggested that this language makes the *Stauffer* opinion "self-limiting." *Kemart Corp. v. Printing Arts Research Laboratories, Inc.*, 269 F.2d 375, 389–90 n.9 (9th Cir. 1959). *See*

also *Wells Fargo & Co. v. Wells Fargo Express Co.*, 358 F.Supp. 1065, 1081–84 (D.Nev.1973), *vacated on other grounds*, 556 F.2d 406 (9th Cir. 1977).

In any event, Job's Daughters' only claim is grounded in false designation of origin. That claim clearly is actionable under section 1125(a), as interpreted in *New West Corp. v. NYM Co. of California*, 595 F.2d 1194 (9th Cir. 1979).

6. Accordingly, federal courts ordinarily apply state law in diversity cases alleging infringement of an unregistered trademark. *See Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293, 1295 & n.2 (9th Cir. 1971); *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1264 & n.4 (5th Cir. 1975); *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270 n.5 (2d Cir. 1974); *Int'l Soc. of Krishna Consciousness, Inc. v. Stadium Auth. of Pittsburg*, 479 F.Supp. 792, 797–98 & n.2 (W.D.Pa.1979).

7. Unfair competition claims under state law may be appended to federal trademark claims. 28 U.S.C. § 1338(b).

law. Job's Daughters has brought what might best be characterized as a hybrid action by relying on federal substantive law but apparently invoking the district court's diversity jurisdiction. Our examination of the pleadings, trial transcript, and briefs persuades us that, despite the invocation of diversity jurisdiction, Job's Daughters intended to assert its federal rights under 15 U.S.C. § 1125.[8] Therefore, we shall treat this case as within the jurisdiction of the district court pursuant to 28 U.S.C. § 1338. *See Vukonich v. Civil Service Comm'n*, 589 F.2d 494, 496 n.1 (10th Cir. 1978).

## II

### INFRINGEMENT

 This court held in *New West Corp. v. NYM Co. of California*, 595 F.2d 1194 (9th Cir. 1979), that section 43 of the Lanham Act, 15 U.S.C. § 1125(a), created a federal remedy against the deceptive use of unregistered trademarks to designate falsely the origin of goods ("passing off"). 595 F.2d at 1198, 1201. *New West* also held that the test for false designation of origin was similar to that for infringement of a registered trademark under 15 U.S.C. § 1114. Both statutes preclude the use of another's trademark in a manner likely to confuse the public about the origin of goods. 595 F.2d at 1201. Thus, we must decide whether Lindeburg is likely to confuse the public about the origin of its jewelry by inscribing the Job's Daughters name and emblem on it.

 Resolution of this issue turns on a close analysis of the way in which Lindeburg is using the Job's Daughters insignia. In general, trademark law is concerned only with identification of the maker, sponsor, or endorser of the product so as to avoid confusing consumers. Trademark law does not prevent a person from copying so–called "functional" features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished

from an assurance that a particular entity made, sponsored, or endorsed a product.

The distinction between trademarks and functional features is illustrated in *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952), where plaintiff, Wallace China, claimed trademark infringement on account of the use by others of the design it used on its china. The court found no trademark infringement because the design served primarily as a functional part of the product:

Imitation of the physical details and designs of a competitor's product may be actionable, if the particular features imitated are "non–functional" and have acquired a secondary meaning. But, where the features are "functional" there is normally no right to relief. "Functional" in this sense might be said to connote other than a trade–mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, *imitation may be forbidden. ...* Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

198 F.2d at 343 (citation omitted). *See also Famolare, Inc. v. Melville Corp.*, 472 F.Supp. 738, 742–45 (D.Hawaii 1979); *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 360. F.Supp. 459, 463–64 (N.D.Tex.1973), *rev'd, Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Restatement of Torts* § 742, comment (a) (1938).

---

8. In order for protection to arise under 15 U.S.C. § 1125(a), the goods involved must have been used in commerce within the control of Congress. *New West Corp. v. NYM Co. of*

*California*, 595 F.2d 1194, 1199 (9th Cir. 1979). It is clear from undisputed facts that Lindeburg's jewelry was so used.

Application of the *Pagliero* distinction to this case has a special twist because the name "Job's Daughters" and the Job's Daughters insignia are indisputably used to identify the organization, and members of Job's Daughters wear the jewelry to identify themselves as members. In that context, the insignia are trademarks of Job's Daughters. But in the context of this case, the name and emblem are functional aesthetic components of the jewelry, in that they are being merchandised on the basis of their intrinsic value, not as a designation of origin or sponsorship.

It is not uncommon for a name or emblem that serves in one context as a collective mark or trademark also to be merchandised for its own intrinsic utility to consumers. We commonly identify ourselves by displaying emblems expressing allegiances. Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.

Job's Daughters relies on *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), in which the Boston Bruins and other National Hockey League clubs brought a trademark infringement suit against a company that sold replicas of the NHL team emblems. The Fifth Circuit,

applying the Lanham Act infringement test and focusing on the "likelihood of confusion," found infringement:

> The confusion or deceit requirement is met by the fact that the defendant duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the teams' trademarks. The certain knowledge of the buyer that the source and origin of the trademark symbols were the plaintiffs satisfies the requirement of the act. The argument that confusion must be as to the source of the manufacture of the emblem itself is unpersuasive, where the trademark, originated by the team, is the triggering mechanism for the sale of the emblem.

510 F.2d at 1012.[9] Job's Daughters asserts that *Boston Hockey* supports its contention that even purely functional use of a trademark violates the Lanham Act. We reject the reasoning of *Boston Hockey*.

Interpreted expansively, *Boston Hockey* holds that a trademark's owner has a complete monopoly over its use, including its functional use, in commercial merchandising.[10] But our reading of the Lanham Act and its legislative history reveals no congressional design to bestow such broad property rights on trademark owners. Its scope is much narrower: to protect consumers against deceptive designations of the origin of goods and, conversely, to enable producers to differentiate their products from those of others. *See Smith v. Chanel, Inc.*, 402 F.2d 562, 566–70 (9th Cir. 1968). *See also HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 716 (9th Cir. 1974); *Developments in the Law—Trademarks and Unfair Competition*, 68 Harv.L.Rev. 814,

**9.** Similar conclusions were reached in *Rolls Royce Motors, Ltd. v. A & A Fiberglass, Inc.*, 428 F.Supp. 689 (N.D.Ga.1977), and *Nat'l Football League Properties, Inc. v. Consumer Enterprises, Inc.*, 26 Ill.App.3d 814, 327 N.E.2d 242 (1975), cert. denied, 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390 (1975).

**10.** The Fifth Circuit itself has apparently retreated from a broad interpretation of *Boston Hockey*. In *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th

Cir. 1977), the court began its analysis of Kentucky Fried Chicken's infringement claim by noting that it "reject[ed] any notion that a trademark is an owner's 'property' to be protected irrespective of its role in the protection of our markets," and described the *Boston Hockey* holding as premised on a finding that consumers were likely to believe that the emblems somehow originated from the hockey clubs. 549 F.2d at 389.

816–17 (1955). The *Boston Hockey* decision transmogrifies this narrow protection into a broad monopoly. It does so by injecting its evaluation of the equities between the parties and of the desirability of bestowing broad property rights on trademark owners.[11] A trademark is, of course, a form of business property. *See* J. McCarthy, *Trademarks and Unfair Competition* §§ 2:6–2:7 (1973). But the "property right" or protection accorded a trademark owner can only be understood in the context of trademark law and its purposes. A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods. *See id.* The *Boston Hockey* court decided that broader protection was desirable. In our view, this extends the protection beyond that intended by Congress and beyond that accorded by any other court. *Cf. Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 389 (5th Cir. 1977) (rejecting the "notion that a trademark is an owner's 'property' to be protected irrespective of its role in the operation of our markets").

Indeed, the court in *Boston Hockey* admitted that its decision "may slightly tilt the trademark laws from the purpose of protecting the public to the protection of the business interests of plaintiffs." 510 F.2d at 1011. We think that this tilt was not slight but an extraordinary extension of the protection heretofore afforded trademark owners. It is an extension we cannot endorse. *See General Mills, Inc. v. Henry Regnery Co.*, 421 F.Supp. 359, 362 & n.2, (N.D.Ill.1976). Instead, we agree with Judge Waterman of the Second Circuit, who recently said that under the Lanham Act "one can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 662 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) (finding that the manufacturer of a "Bionic Boot" did not infringe the trademark of the producers of the "Bionic Woman" television program).

Our holding does not mean that a name or emblem could not serve simultaneously as a functional component of a product and a trademark. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir. 1979). That is, even if the Job's Daughters' name and emblem, when inscribed on Lindeburg's jewelry, served primarily a functional purpose, it is possible that they could serve secondarily as trademarks if the typical customer not only purchased the jewelry for its intrinsic functional use and aesthetic appeal but also inferred from the insignia that the jewelry was produced, sponsored, or endorsed by Job's Daughters. *See generally*, Grimes & Battersby, *The Protection of Merchandising Properties*, 69 TMR 431, 441–45 (1980). We recognize that there is some danger that the consumer may be more likely to infer endorsement or sponsorship when the consumer is a member of the group whose collective mark or trademark is being marketed. Accordingly, a court must closely examine the articles themselves, the defendant's merchandising practices, and any evidence that consumers have actually inferred a connection between the defendant's product and the trademark owner.

The trial court made comprehensive findings of fact that provide an adequate record for this court to review the trial court's conclusion of law that the names and emblems were trademarks. *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 443–44 (9th Cir. 1980); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346–47 (9th Cir. 1979).[12]

---

**11.** We express no opinion about whether Job's Daughters could prevent Lindeburg from using its name and emblem under federal patent law, federal copyright law, or state unfair competition law.

**12.** The trial court concluded:

Defendant has used plaintiff's trademarks in its catalogues and on merchandise and such

We conclude from our examination of the trial judge's findings and of the underlying evidence that Lindeburg was not using the Job's Daughters name and emblem as trademarks. The insignia were a prominent feature of each item so as to be visible to others when worn, allowing the wearer to publicly express her allegiance to the organization. Lindeburg never designated the merchandise as "official" Job's Daughters' merchandise or otherwise affirmatively indicated sponsorship. Job's Daughters did not show a single instance in which a customer was misled about the origin, sponsorship, or endorsement of Lindeburg's jewelry, nor that it received any complaints about Lindeburg's wares. Finally, there was evidence that many other jewelers sold unlicensed Job's Daughters jewelry, implying that consumers did not ordinarily purchase their fraternal jewelry from only "official" sources. We conclude that Job's Daughters did not meet its burden of proving that a typical buyer of Lindeburg's merchandise would think that the jewelry was produced, sponsored, or endorsed by the organization. The name and emblem were functional aesthetic components of the product, not trademarks. There could be, therefore, no infringement.

The judgment of the district court is reversed and the case is remanded for the entry of judgment in favor of appellant Lindeburg.

use creates a likelihood of confusion in the public mind as to the relationship between plaintiff and defendant. *See [Boston Hockey].*