WESTINGHOUSE ELECTRIC COR-
PORATION, Plaintiff–Counter–
Defendant–Appellant,

v.

GENERAL CIRCUIT BREAKER &
ELECTRIC SUPPLY INC.; AC Circuit
Breaker–Electric Supply, Inc.; General
Circuit Breaker & Electric Supply Inc.;
Xavier Contreras; Pencon Internation-
al, Inc.; General Magnetics/Electric
Wholesale; The Estate of Charley
Contreras; Panelboard Specialties
Wholesale Electric, Inc.; Jaime A.
Contreras, Defendants–Appellees,

Joe A. Contreras, Defendant–Counter–
Claimant–Appellee.

In re CIRCUIT BREAKER LITIGATION

WESTINGHOUSE ELECTRIC COR-
PORATION, Plaintiff–Counter–
Defendant–Appellant,

v.

AC CIRCUIT BREAKER–ELECTRIC
SUPPLY, INC.; Joe A. Contreras; Gen-
eral Circuit Breaker & Electric Supply
Inc.; Xavier Contreras; Pencon Interna-
tional, Inc.; The Estate of Charley
Contreras; Panelboard Specialties
Wholesale Electric, Inc.; General Mag-
netics/Electric Wholesale; Jaime A.
Contreras, Defendants–Counter–Claim-
ants–Appellees.

WESTINGHOUSE ELECTRIC COR-
PORATION, Plaintiff–Counter–
Defendant–Appellee,

v.

GENERAL CIRCUIT BREAKER &
ELECTRIC SUPPLY INC.; Joe A.
Contreras; AC Circuit Breaker–Electric
Supply, Inc.; General Circuit Breaker &
Electric Supply Inc.; Xavier Contreras;
Pencon International, Inc.; General
Magnetics/Electric Wholesale; The Es-
tate of Charley Contreras, Defendants–
Counter–Claimants,

and

Panelboard Specialties Wholesale Electric,
Inc.; Jaime A. Contreras, Defendants–
Counter–Claimants–Appellants.

WESTINGHOUSE ELECTRIC COR-
PORATION, Plaintiff–Counter–
Defendant–Appellee,

v.

GENERAL CIRCUIT BREAKER &
ELECTRIC SUPPLY INC.; Joe A.
Contreras; AC Circuit Breaker–Electric
Supply, Inc.; General Circuit Breaker–
Electric Supply Inc.; Xavier Contreras;
Panelboard Specialties Wholesale Elec-
tric, Inc.; Jaime A. Contreras, Defen-
dants–Counter–Claimants,

and

Pencon International, Inc.; General Mag-
netics/Electric Wholesale; The Estate of
Charley Contreras, Defendants–Coun-
ter–Claimants–Appellants.

In re CIRCUIT BREAKER LITIGATION

WESTINGHOUSE ELECTRIC CORPO-
RATION, Plaintiff–Counter–Defen-
dant–Appellant–Cross–Appellee,

v.

GENERAL CIRCUIT BREAKER &
ELECTRIC SUPPLY CO.; Xavier
Contreras; AC Circuit Breaker–Electric
Supply, Inc.; Joe A. Contreras; Pencon
International, Inc.; The Estate of Char-
ley Contreras; General Magnetics/Elec-
tric Wholesale; Panelboard Specialties
Wholesale Electric, Inc.; Jaime A.
Contreras, Defendants–Counter–Claim-
ants–Appellees–Cross–Appellants.

Nos. 94–56436, 94–56709, 94–56765,
94–56769, 94–56771.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1996.

Decided Feb. 10, 1997.

Order Amending Caption and Denying
Rehearing and Rehearing En
Banc March 27, 1997.

**896**

Gregory P. Stone (argued), Joseph D. Lee, and Ted G. Dane, Munger, Tolles & Olson, Los Angeles, CA, for the plaintiffs–appellants–cross–appellees.

George A. Oakes, Alan H. Stanfill (argued), and David A. Huffaker, Throckmorton, Beckstrom, Oakes & Tomassian, Pasadena, CA, for defendants–appellees–cross–appellants General Circuit Breaker & Electric Supply, Inc. and Xavier Contreras.

J. Scott Bennett, Law Offices of J. Scott Bennett, Lake Elsinore, CA, and George A. Oakes, Throckmorton, Beckstrom, Oakes & Tomassian, Pasadena, CA, for defendants–appellees–cross–appellants Panelboard Specialties Wholesale Electric, Inc. and Jaime Contreras.

Mark D. Rutter (argued), Moore, Rutter & Evans, Long Beach, CA, and Michael J. Emling, Law Offices of Michael J. Emling, Long Beach, CA, for defendants–appellees–cross–appellants Pencon International, Inc., General Magnetics/Electric Wholesale, and the Estate of Charley Contreras.

Before: BRUNETTI, TROTT and THOMAS, Circuit Judges.

TROTT, Circuit Judge.

## I. OVERVIEW

This appeal arises from a suit brought by Westinghouse Electric Corporation ("Westinghouse") against several electronics vendors ("defendants") for reselling used Westinghouse circuit breakers after reconditioning them and attaching labels bearing the Westinghouse trademark.[1] After a jury trial, the district court entered judgment in favor of the defendants on all of Westinghouse's claims. In reaching this judgment, the district court upset one jury verdict in favor of Westinghouse on its trademark infringement claim. The district court concluded that this verdict had resulted from an erroneous jury instruction regarding the elements necessary to prove the defendants' affirmative defenses of estoppel, acquiescence, and laches. That instruction had required the defendants to show that Westinghouse knew the defendants were copying the Westinghouse trademark—rather than merely using an original trademark without permission—in order to establish their affirmative defenses. To correct the instructional error, the district court examined the pattern of jury verdicts, determined the facts necessarily found by the jury in reaching those verdicts, and applied the correct law to those implicit factual findings. This application led the district court to set aside the jury's verdict on the trademark infringement claim and enter judgment in favor of the defendants on all claims.

On appeal, Westinghouse argues that the district court erred: 1) by concluding that the jury instructions misstated the law; 2) by upsetting the jury verdict as a remedy for the instructional error rather than ordering a new trial; and 3) by denying Westinghouse's request to permanently enjoin the defendants from misusing the Westinghouse trademark. We agree with the district court's holding that the jury instructions focused the jury's attention on an irrelevant concern— whether Westinghouse knew the labels were duplicated rather than simply used without permission. Because in the limited circum-

---

**1.** The cross-appellants' motions for leave to file     final supplemental excerpts are granted.

stances of this case it is possible to determine the jury's implicit factual findings from the pattern of verdicts and thereby to remedy the prejudice caused by the flawed instructions, we affirm the district court's entry of judgment against Westinghouse. Also, because the district court's reasons for denying the permanent injunction are legally sufficient and well-supported by the record, we affirm the district court's order denying the injunction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Westinghouse manufactures "molded case circuit breakers," safety devices that interrupt electrical flow in the event of an overload or short-circuit. Westinghouse attaches labels to each breaker. The labels bear the Westinghouse trademark and, as required by various electrical codes and standards, provide information about the breaker's electrical characteristics.

The defendants are vendors of circuit breakers who recondition, and then resell, used Westinghouse breakers. Prior to this case, and as part of the reconditioning process, the defendants typically cleaned the breakers and sometimes replaced the internal components. In addition, when the breaker labels were faded or otherwise illegible, the defendants often replaced the labels. The defendants would obtain replacement labels from Westinghouse employees or would make copies of the original labels. The labels attached by the defendants never noted the breakers had been reconditioned; they bore the same information as the original label, including the Westinghouse trademark.

### B. The Trial and the Jury Verdicts

In 1988, Westinghouse brought suit against the defendants for: (1) trademark counterfeiting under section 32 of the Lanham Act, 15 U.S.C. § 1114 ("trademark counterfeiting" claim); (2) unfair competition under section 43 of the Lanham Act, 15 U.S.C. § 1125 ("unfair competition" claim); and (3) unfair competition and trademark dilution under California law ("state law" claims).

Westinghouse sought a permanent injunction forbidding the defendants from reproducing its trademarks and requiring them to disclose the condition of the breakers they sell. Westinghouse also sought damages for past infringement.

The defendants admitted the facts underlying Westinghouse's claims—that they had sold reconditioned breakers bearing the Westinghouse mark without noting they had been reconditioned. The defendants argued, however, that they never intended to deceive anyone; they only intended to comply with regulations requiring the breakers to bear labels describing their electronic characteristics. The defendants also argued Westinghouse knew or should have known the defendants were selling reconditioned breakers bearing the Westinghouse mark, because Westinghouse itself knowingly purchased reconditioned breakers from the defendants and resold them without labelling them as reconditioned. Based on this evidence, the defendants raised several affirmative defenses, including estoppel, laches, acquiescence, and unclean hands.

Following trial, the jury received four verdict forms, one for each defendant. For each of Westinghouse's five claims, the form asked the jury to determine whether Westinghouse had proved the claim and then whether the defendant had proved any affirmative defenses to that claim. The form did not require the jury to make express findings of fact. Rather, it simply asked the jury to make separate legal conclusions regarding each of Westinghouse's claims and the affirmative defenses to those claims.

On July 16, 1993, the jury returned its verdict forms. The forms indicated that Westinghouse had established both its unfair competition claim and its trademark counterfeiting claim, as well as one of their state law claims. The forms also stated, however, that defendants had established affirmative defenses to all of Westinghouse's claims except the trademark counterfeiting claim.

### C. The District Court Judgment

The district court was perplexed by the jury's seemingly contradictory verdicts on the defendants' affirmative defenses. The

district court observed that "evidence [that the affirmative defenses applied to the unfair competition claim] also should have mandated the same result on the [trademark counterfeiting] claim, since [an unfair competition] claim completely subsumes a [trademark counterfeiting] claim." *In re Circuit Breaker Litig.*, 852 F.Supp. 883, 887 (C.D.Cal.1994). Upon further reflection, however, the court concluded that "[t]he jury's answers were absolutely consistent with both the instructions and the evidence presented." *Id.* The critical difference between the defenses to the trademark infringement claim and to the unfair competition claim, the district court held, lay in the jury instruction regarding the elements needed to prove each defense. *Id.* at 887–88.

Jury instruction number 65, which was proposed by Westinghouse and given by the court over the defendants' timely objection, required the defendants to show Westinghouse knew or should have known the defendants were duplicating Westinghouse labels, rather than merely using originals, in order to establish their affirmative defenses to trademark counterfeiting. By contrast, the instruction did not require the defendants to prove Westinghouse knew they were copying labels to establish their defenses to the unfair competition claim; they only needed to prove Westinghouse knew they were using the Westinghouse mark.[2] Thus, the additional element of duplication required by instruction 65 for the trademark counterfeiting claim logically explained the jury's disparate treatment of the two claims.

The problem with the verdicts, the district court concluded, was that the jury instruction misstated the elements needed to prove affirmative defenses to Westinghouse's trademark counterfeiting claim. To establish affirmative defenses to the trademark counterfeiting claim, the district court held, defendants needed only to prove that Westinghouse knew defendants were using the Westinghouse mark, whether or not the marks were copied. Thus, the district court concluded that jury instruction number 65 misstated the law and that the error caused the jury's verdict in favor of Westinghouse.

To remedy the prejudice caused by the erroneous instruction, the district court identified from the pattern of jury verdicts the facts necessarily found by the jury and then applied the correct law to those facts. Because the jury found for the defendants on the affirmative defenses to the unfair competition claim, the district court concluded the jury necessarily found that Westinghouse knew or should have known that the defendants were selling reconditioned breakers bearing the Westinghouse mark without labelling them as reconditioned. *See* Jury Instruction Number 65, note 1, *supra.* The district court held that this implicit factual finding was also sufficient as a matter of law to establish the defendants' affirmative defenses to the trademark counterfeiting claim. Accordingly, rather than ordering a new trial, the district court entered judgment in favor of the defendants on all claims. 852 F.Supp. at 897.

## D.  The Denial of Injunctive Relief

On August 22, 1995, following subsequent hearings, the district court also denied the plaintiff's motion for permanent injunctive relief. *In re Circuit Breaker Litig.*, 860 F.Supp. 1453 (C.D.Cal.1994). The district court held that a permanent injunction was

---

**2.**  Instruction 65 stated:

[T]o sustain their defenses as to plaintiff's unfair competition and trademark dilution claims, defendants must prove that plaintiff knew or should have known all the facts giving rise to these particular claims, namely that defendants were selling used and reconditioned Westinghouse molded case circuit breakers without adequate disclosure of their condition.

\* \* \* \* \* \*

In order to sustain their laches, estoppel and acquiescence defenses against plaintiff's trademark counterfeiting claim, defendants must prove that plaintiff knew or should have known all the facts giving rise to this particular claim, namely *that defendants were copying the Westinghouse trademarks* and applying them to used and reconditioned molded case circuit breakers that were sold in commerce without adequate disclosure of their condition. (Emphasis added).

not warranted, because the defendants had established affirmative defenses to the trademark claims; because Westinghouse had not shown the defendants were likely to infringe in the future; and because the defendants had innocently infringed without substantially harming the public. *Id.* at 1456.

## III. DISCUSSION

### A. Instruction 65

■ As the district court indicated in its opinion, "instruction 65[is] the fulcrum of this case." 852 F.Supp. at 892. We must first determine whether instruction 65 misstated the law by requiring the defendants to prove Westinghouse knew that the defendants were copying its trademark, as opposed to simply using the original mark without permission. Whether a jury instruction misstates the elements that must be proved at trial is a question of law, which we review de novo. *Caballero v. City of Concord,* 956 F.2d 204, 206 (9th Cir.1992).

[2] To establish their equitable defenses of estoppel, laches, and acquiescence, the defendants had to prove Westinghouse knew of facts giving it notice of its trademark counterfeiting cause of action, not just any cause of action. *Cf. Hobson v. Wilson,* 737 F.2d 1, 35 (D.C.Cir.1984) (holding that for constructive discovery of a cause of action to trigger the statute of limitations, the plaintiff must know facts giving notice of the particular cause of action at issue), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Whether the defendants were required to prove Westinghouse knew they were duplicating labels thus turns on the question of whether trademark duplication is a necessary element—as opposed to a mere detail—of Westinghouse's trademark counterfeiting claim. In other words, if Westinghouse is required to prove the defendants were duplicating the Westinghouse mark in order to establish its trademark counterfeiting cause of action, then the defendants are required to prove Westinghouse knew they were duplicating the mark to establish equitable defenses to that cause of action. Because the duplicate/original distinction is not relevant to a trademark counterfeiting claim,

we affirm the district court's holding that the defendants were not required to prove that Westinghouse knew they were duplicating labels.

Section 1114 of the Lanham Act, which establishes the trademark counterfeiting cause of action, prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods ... [where] such use is likely to cause confusion ... or to deceive." 15 U.S.C. § 1114(1)(a). Westinghouse argues that misuse of *original* marks (as opposed to copied marks) does not constitute trademark counterfeiting, because original labels are not a "reproduction, counterfeit, copy, or colorable imitation." As a result, Westinghouse contends instruction 65 was correct in requiring the defendants—in order to establish their affirmative defenses—to prove Westinghouse knew, or should have known, the defendants were photocopying the Westinghouse labels, not just that they were misusing original Westinghouse labels.

[3] The original Westinghouse labels are not themselves "counterfeits" in the literal sense. But the aim of section 1114 is broader than the prohibition of "counterfeiting." The statute was intended "to protect consumers against deceptive designations of the origin of goods," not just to prevent the duplication of trademarks. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 918 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *see also Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 329 (6th Cir.) ("The essence of the wrong of trademark infringement is the passing off of the goods of one as those of another."), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973). Thus, the important test is whether the practice of the defendant is likely to cause confusion, not whether the defendant duplicated the plaintiff's mark. *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 861 (5th Cir.1967) ("Confusion, or the likelihood of confusion ... is the real test of trademark infringement."); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2.03 (3d ed. 1996)

("Whatever route one travels, whether by trademark infringement or unfair competition, the signs give direction to the same enquiry—whether defendant's acts are likely to cause confusion.").

■ Of course, a copy of a mark is no more likely to confuse the public than is the original; in fact, the public is more likely to be deceived by an original mark because it serves as a perfect imitation. In short, the distinction between using a duplication versus using an original has no relevance to the purposes of trademark law. When an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a "counterfeit" just as it would if an imitation of the mark were attached.

In *General Electric Company v. Speicher,* 877 F.2d 531 (7th Cir.1989), the Seventh Circuit held that the act of placing non-General Electric products in boxes that General Electric had stamped with its registered "GE" trademark qualified as the use of a "reproduction, counterfeit, copy, or colorable imitation" of the mark. As Judge Posner explained:

> We can see no difference, so far as the objectives of section 1114(1)(a) are concerned, between [unauthorized use of GE's original trademark] and making a reproduction of GE's trademark. The happenstance of having trademarks made by the owner in one's possession, so that one doesn't have to copy them, has no relevance to the purposes of the statute. Indeed, the danger of confusion is even greater because the "imitation" is not merely colorable, but perfect. The more fundamental point is that the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute.

*Id.* at 534.

Other circuits have also held that the unauthorized use of an original trademark can qualify as trademark counterfeiting. *See Burger King Corp. v. Mason,* 710 F.2d 1480, 1491 (11th Cir.1983) (holding franchisee liable for displaying the original Burger King marks after its right to do so had been revoked), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984); *El Greco Leather Prod. Co. v. Shoe World, Inc.,* 806 F.2d 392, 396 (2d Cir.1986) (holding shoe manufacturer liable for selling shoes bearing the genuine Candie's trademark after its contract with Candie's had been cancelled), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). Many district courts have found parties using original trademarks liable for trademark infringement as well. *See Interstate Battery Sys. of Am., Inc. v. Wright,* 811 F.Supp. 237, 244 (N.D.Tex.1993) (holding defendant liable for trademark counterfeiting where defendant affixed original stickers or labels acquired from the manufacturer to batteries not manufactured by authorized manufacturers); *Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135 (D.Colo.1980) (holding defendant liable under section 1114 for transporting and selling Coors beer in the original trademarked packages without maintaining the quality control standards of Coors).

The logic of these holdings is consistent with the "keystone" of trademark law: the likelihood of confusion in the minds of the buying public. *See* McCarthy, *supra,* § 2.03. Accordingly, we adopt the reasoning of these opinions and hold that instruction 65 misstated the elements required to prove affirmative defenses to a trademark counterfeiting claim. Because duplication of the trademark is not an element of the trademark counterfeiting claim, the defendants were not required to prove that Westinghouse knew, or should have known, the defendants were duplicating labels in order to establish their equitable defenses.

We emphasize that our holding does not give license to defendants to duplicate trademarks. The defendants escaped liability in this case only because they proved Westinghouse knew or should have known they were using the Westinghouse trademark. In other words, Westinghouse did establish its claim for trademark infringement based on the defendants' conduct in selling reconditioned breakers bearing the Westinghouse trademark, but that claim was overcome by the defendants' affirmative defenses.

## B. The District Court's Remedy for the Erroneous Instruction

■ To remedy the harm caused by the flawed instruction, the district court studied the factual findings implicit in the pattern of jury verdicts. The district court then used the factual findings necessarily determined by the jury in reaching its other verdicts as the basis for reversing the sole verdict in favor of Westinghouse. Whether it is permissible for a trial judge to disrupt the jury verdict on this basis is a question of law, which we review de novo.

The answer to this question derives from the most basic of principles regarding the respective roles of judge and jury: juries find the facts and judges determine the law. We must determine whether the trial judge overstepped the boundary dividing these roles when he changed the jury verdicts to accord with the jury's implicit factual findings. In the limited circumstances of this case, we hold that the judge did not.

■ In interpreting jury verdicts, we must assume that the jury followed the trial court's instructions. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985); *see also Parker v. Randolph*, 442 U.S. 62, 75 n. 7, 99 S.Ct. 2132, 2141 n. 7, 60 L.Ed.2d 713 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions."). Therefore, we must assume the jury found certain facts when it found the defendants had established affirmative defenses to Westinghouse's unfair competition claim. Specifically, in accord with the correct portion of instruction 65, the jury must have found that Westinghouse knew or should have known "the defendants were selling used and reconditioned Westinghouse molded case circuit breakers without adequate disclosure of their condition." *See* Jury Instruction Number 65, note 1, *supra.* This finding of fact was necessarily determined by the jury and essential to their judgment on the unfair competition claim.

Because this finding also supports the legal conclusion that the defendants established their affirmative defenses to the trademark counterfeiting claim, it was logically appropriate for the trial judge to enter judgment on the trademark counterfeiting claim in favor of defendants.

■ The district court's actions are directly analogous to the ordinary application of issue preclusion. Under the doctrine of issue preclusion, a court can enter judgment as to issues that were actually litigated and determined in a prior adjudication, so long as the determination was a necessary part of the judgment in the earlier action. *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir.1992). Furthermore, the judge is allowed to draw necessary inferences from the prior adjudication in order to determine whether an issue was actually decided.

> [W]here the court has made no express findings on issues raised by the pleadings or the evidence, the court in the second case may infer that in the prior action a determination appropriate to the judgment rendered was made as to each issue that was so raised and the determination of which was necessary to support the judgment.

1B James WM. Moore et al., Moore's Federal Practice ¶ .443(4), at III.–581 (2d ed. 1984); *see also Chew v. Gates,* 27 F.3d 1432, 1438 (9th Cir.1994) ("*Necessary* inferences from the judgment, pleadings, and evidence will be given preclusive effect.... Where the prior judgment was based on a general verdict, the inquiry is whether rational jurors must necessarily have determined the issue as to which estoppel is sought.") (citations omitted), *cert. denied,* — U.S. —, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995). Similar to traditional issue preclusion analysis, the district court in this case merely drew inferences from the verdicts to determine the issues that the presumptively rational jurors must have determined, and then used those implicit findings of fact as the basis for judgment as to certain issues.[3]

**3.** This analysis of issue preclusion also shows why ordering a new trial would produce an anomalous result. If the district court had or- dered a new trial only on the trademark counterfeiting claim, the jury's earlier findings on the unfair competition claim would preclude West-

The district court's reasoning in determining whether the jury necessarily found facts establishing the defendants' affirmative defenses is also analogous to the reasoning applied in criminal cases to determine whether an instructional error was harmless. In *Carella v. California*, 491 U.S. 263, 271, 109 S.Ct. 2419, 2423–24, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring), for example, Justice Scalia explained that a flawed jury instruction is harmless if, despite the error, the court can determine that the jury necessarily found the elements of the crime. *See also California v. Roy*, —— U.S. ——, ——— ———, 117 S.Ct. 337, 339–40, 136 L.Ed.2d 266 (1996) (Scalia, J., concurring) (noting that an instructional error is harmless where the jury verdict on other points effectively embraces the elements affected by the error). As in *Carella* and *Roy*, the district court in this case examined the jury's verdicts to determine whether, despite the instructional error, the jury necessarily found all the proper elements of the defendant's affirmative defenses. Because the jury must have found the elements necessary to establish the defendants' equitable defenses, the district court appropriately entered judgment in favor of the defendants.

Westinghouse observes that the law forbids a judge from upsetting general verdicts merely because they are inconsistent as to different claims. *See Dunn v. United States*, 284 U.S. 390, 393–94, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932) ("Consistency in the verdict is not necessary.... That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters."). Because inconsistent verdicts are allowed to stand, Westinghouse argues, it is impossible to draw logical inferences from the jury verdicts. *See United States v. Heimann* 705 F.2d 662, 670 (2d Cir.1983) ("[S]ince jurors' verdicts need not be consistent it would be

inappropriate to draw an inference from the pattern of verdicts as to the jury's findings ....") (citations omitted). In other words, Westinghouse contends that, because the jury verdict could have resulted from simple mistake, a desire to "split the baby," or some other inexplicable factor, it is impossible to infer from the pattern of verdicts that the jury made certain findings of fact.

Westinghouse's argument necessarily implies that the jury disregarded its instructions. Thus, the argument directly offends well-established precedents requiring the court to presume that juries follow the law. *See Aspen Skiing Co.*, 472 U.S. at 604, 105 S.Ct. at 2858. The cases Westinghouse cites for the proposition that inconsistent verdicts must be allowed to stand all involve situations where "it is unclear whose ox has been gored;" in other words, it is impossible to tell which verdict is the correct one. *See, e.g., United States v. Powell*, 469 U.S. 57, 65, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984). That is not the case here. In this case, there is an identifiable error that only could have affected one of the verdicts. If we presume the jury followed their instructions, as we must, it is possible to determine the facts necessarily found by the jury and thereby to remedy the error. Thus, a court in these very limited circumstances can reconcile the verdicts without intruding upon the jury's fact-finding role.

In sum, the facts of this case present a seemingly rare situation. Despite an erroneous jury instruction, it is possible to examine the pattern of jury verdicts and logically determine what facts a rational juror must have found in order to reach those verdicts. As a result, it was possible for the trial judge to apply the correct law to these implicit factual findings and thereby to remedy the harm from the erroneous jury instruction without the expense and delay of a new trial. In circumstances such as these—where the necessary factual findings can be determined from the pattern of verdicts—justice has nothing to gain from a new trial.

inghouse from challenging the validity of the defendants' affirmative defenses. Thus, the results upon retrial would be identical to the status quo. *See Green v. American Tobacco Co.*, 325 F.2d 673, 678 (5th Cir.1963) (holding that, on retrial, the court must treat the issues validly decided by the jury's special interrogatories as conclusively established), *cert. denied*, 377 U.S.

943 (1964). On the other hand, if the district court had ordered a new trial on all of the plaintiff's claims, then the parties would have been forced to relitigate claims on which they already have valid, and undisputed, jury verdicts. *See Herber v. Johns–Manville Corp.*, 785 F.2d 79, 85–86 (3d Cir.1986) (directing re-trial only on the claims and issues affected by the trial error).

## C. Denial of Injunctive Relief

■ The Lanham Act gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation" of a registrant's rights. 15 U.S.C. § 1116(a). A plaintiff is not automatically entitled to an injunction simply because it proved its affirmative claims. *Pyrodyne Corp. v. Pyrotronics Corp.*, 847 F.2d 1398, 1402 (9th Cir.) ("[T]he grant of injunctive relief is not a ministerial act flowing as a matter of course.") (citing *U.S. Jaycees v. Cedar Rapids Jaycees*, 794 F.2d 379, 382 (8th Cir.1986)), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988).

In this case, the district court refused to enter a permanent injunction directing the defendants to follow a specific labelling program on three grounds: 1) because the defendants had proven equitable defenses to the Lanham Act claims; 2) because the defendants' infringement caused little harm in light of the effective performance of the re-conditioned breakers; and 3) because the defendants are not likely to harm the public in the future given that they discontinued their relabelling practices before this litigation began more than seven years ago. *In re Circuit Breaker Litig.*, 860 F.Supp. at 1456. Westinghouse argues the district court's grounds for denying the injunction were not supported by the evidence and were insufficient to justify denying the injunction.

■ We review a trial court's decision to deny injunctive relief for an abuse of discretion. *Multnomah Legal Serv. Workers Union v. Legal Serv. Corp.*, 936 F.2d 1547, 1552 (9th Cir.1991). A district court abuses its discretion if its conclusion is based on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions. *Id.* Here, the defendants' equitable defenses are in themselves sufficient to justify the district court's refusal to enter a permanent injunction. *See Pyrodyne*, 847 F.2d at 1401–03; *E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983) ("Laches can bar recovery in trademark or tradename actions where injunctive relief is sought."). The court's findings that the defendants were innocent infringers and that they were not likely to harm the public in the future offer additional justification for the denial, and these findings are supported by the record. *See, e.g., Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir.1969) (denying injunction because defendant had discontinued conduct prior to trial and showed no intention of resuming). Accordingly, we hold that the district court did not abuse its discretion in denying the injunction.

## IV. CONCLUSION

Instruction 65 misstated the law insofar as it required the defendants to prove Westinghouse knew they were duplicating the Westinghouse trademark in order to establish affirmative defenses to Westinghouse's trademark counterfeiting claim. Realizing the jury received erroneous instructions, the trial judge examined the pattern of jury verdicts and concluded the error was not harmless; in fact, the error determined Westinghouse's verdict on the trademark counterfeiting claim.

Ordinarily, when faced with an outcome—determinative error in instructing the jury, a trial judge should order a new trial. Moreover, in most cases where a jury renders inconsistent verdicts, the trial judge must allow those verdicts to stand because "it is unclear whose ox has been gored." *Powell*, 469 U.S. at 65, 105 S.Ct. at 477. But in the limited circumstances of this case, where an identifiable error affected only one of the jury verdicts, and the factual findings necessarily determined by the jury can be discerned from the other verdicts, there is nothing to be gained from a new trial. In these circumstances, a trial court may apply the correct law to the jury's implicit factual findings and enter judgment accordingly without intruding upon the province of the jury. Accordingly, we affirm the district court's judgment in favor of the defendants. Also, because the defendants established affirmative defenses to Westinghouse's trademark claims, we affirm the district court's order denying a permanent injunction.

**AFFIRMED.**

## ORDER

March 27, 1997

Square D Company's motion to amend the caption in this case is granted. The above caption has been modified as requested.

The panel as constituted in the above case has voted to deny the appellant's petition for rehearing and to reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R.App.P. 35(b).

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.